## DROUGHT *v.* THE STATE.

Where a person charged as a common cheat and swindler is accused of making false representations in selling certain receiver's certificates in order to induce the purchase thereof by another, the alleged representations being in effect that such certificates were good and that they were a first lien on a railroad, and it being further alleged in the accusation that such representations were false, and that such certificates were worthless at the time such representations were made and were not a first lien on the road; and where at the trial it appears that the certificates were in fact a first lien on the road at the time the representations were made, and that, according to the interlocutory orders under which the certificates were issued, this lien followed the property upon which they rested even in the hands of the purchaser after the road had been sold; and where it further appears that the purchaser of the certificates has made no effort to assert his lien, the evidence fails to show either that the alleged representations contained in the accusation were false or that the person alleged to have been defrauded had in consequence of these representations suffered any damage, and a conviction resting upon such evidence is contrary to law and evidence. This is true even though it appears that, in a proceeding to which the holder of such certificates was not a party, the proceeds arising from the sale of the properties covered by the receiver's certificates had been appropriated by judicial decree to the payment of the expenses of the administration of the property by the receiver.

Argued May 3, — Decided May 19, 1897.

Indictment for cheating and swindling. Before Judge Berry. Criminal court of Atlanta. February term, 1897.

*Robert J. Jordan*, for plaintiff in error.
*James F. O'Neill, solicitor,* contra.

SIMMONS, C. J. Drought was accused in the city court of Atlanta of the offense of being a common cheat and swindler. The accusation alleged, in substance, that he had cheated and defrauded Eady & Mayfield of eight hundred dollars and of stock of the Oakview Cemetery Company of the par value of $40,000 but of the real value of $1,600; that he did this by making certain false representations, the material part of which consisted in exchanging with them, for the eight hundred dollars and the cemetery stock above mentioned, four receiver's certificates of the face value of five hundred dollars each, with accrued interest, and in representing to them, at the time of the exchange, that the certificates were good and were worth the principal and accrued interest expressed on their

face; that the railroad owed nothing, all of its debts having been paid; that it owed him as receiver nothing; that its road-bed, ties and rails alone were worth at least $340,000; and that the court had decreed the sale of the road for not less than $75,000 in cash; that receiver's certificates to the amount of $25,000 had been issued, and that by order of court these certificates were to be paid immediately upon the sale of the road and were to have priority over everything else. It was further alleged that these representations were false, and were, at the time made, known to be false, and that Eady & Mayfield were thereby defrauded. Upon this accusation Drought was convicted. He moved for a new trial, and the motion was overruled.

The evidence shows, that at the time Drought made these representations, the road was in the hands of a receiver; that the court had issued an order allowing the receiver's certificates to be issued; that Drought furnished the prosecutors with "papers showing the certificates to be good"; that the court, by the decree authorizing the issue of the certificates, made them a first lien upon the road after the expenses of administration had been paid, and if the road should not bring enough at the sale to pay the expenses and the certificates, then the latter were to become a first lien upon the road in the hands of the purchaser thereof. The evidence further shows, that at the time the representations were made the court had issued an order for the sale of the road, and that the upset price of the same was made $75,000. After the representations were made, it appears that the road was exposed to sale and failed to bring the upset price. Another order for the sale was then issued, in which the upset price was placed at $40,000. Again the road was exposed to sale, and again there were no bidders. The judge issued another order authorizing the sale, without fixing an upset price, and the road was sold under this order for $25,000. This amount was not sufficient to pay off the expenses of administration and the certificates, and was applied to the settlement of the former. Thus it appears from the evidence that all the material representations made by Drought were absolutely true, to wit: that the re-

ceiver's certificates were good and were a first lien upon the road, and that the road had been ordered to be sold at an upset price of $75,000, which would have been amply sufficient to have paid off all expenses and the certificates. Drought could be convicted only upon the theory that the representations, at the time the exchange took place, were false. He was not responsible for decrees of court, made afterward, which lessened the upset price of the road. The evidence is clear that, at the time he made the representation that the upset price of the road was $75,000, it was true. The decree of the court shows it to have been true; and the later decree, fixing it at $40,000, was issued after the sale of the certificates to Eady & Mayfield. The evidence is equally clear as to the certificates being a first lien upon the road. While it is true that the order or decree authorizing the certificates to be issued gave priority in order of payment to expenses of administration, it can be fairly inferred from the evidence that Drought furnished the prosecutors with the decrees of court authorizing the issue of the certificates; for Smith, cashier of the First National Bank of Gainesville, Ga., with whom the certificates were placed as collateral, testified that Eady & Mayfield furnished him with papers showing that the certificates were good. The decrees, if they had them, showed that they gave the expenses of administration priority of payment over the certificates. Even if the decrees were not exhibited, the testimony of B. G. Smith, one of the witnesses for the prosecution, shows that Drought told Eady & Mayfield that the expenses of administration were to be paid before the certificates. If this testimony is true, they could not have been deceived upon this point.

The real question in the case, however, is whether the certificates were a good and valid lien upon the road. We think, from the record before us, that they were and still are valid and binding upon the road, for the decree authorizing their issue expressly declares, in substance, that if the road does not bring enough at the sale to pay both the expenses and the certificates, the latter shall still be a first lien on the road in the hands of the purchaser. If any other order or decree was

passed by the court revoking or changing this order, it does not appear in the record; even granting that the court could pass such an order, displacing the lien of the certificates after they had been issued and were in the hands of innocent purchasers. If such an order could have been passed, it was at least not passed until after the alleged fraudulent representations were made; and, as before remarked, Drought, the accused, could not be held responsible for subsequent decrees of the court.

In our opinion, the State failed utterly to make out the material allegations in the accusation. The prosecution seems to us to have been instituted more for the collection of a debt than to enforce the criminal law. This court is now, and has always been, in favor of the strictest enforcement of the criminal laws of the State, but it is now, and has always been, opposed to any use of criminal process for the collection of debts. If courts were allowed to equalize errors, or to set off one questionable trade against another, this in our opinion would be a proper case to do so. Even if all the charges of the prosecutors are true, the evidence in the record shows that Drought got no advantage of them. He gave them $2,400 worth of certificates which are a first lien upon a railroad, and took from them in exchange $800 in cash and $40,000 in stock of a cemetery company which at that time had not been organized, the stock representing a small tract of land in which the promoters had put in cash only $700, and on which they had issued stock to the amount of $200,000. $20,000 of this stock was shortly thereafter pledged to secure a loan of thirty-five dollars. Altogether, the scheme of this cemetery company, as shown by this record, seems equal to any conceived by Mulberry Sellers.

*Judgment reversed. All the Justices concurring.*